lml

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| PETER IRELAND, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | Case No. 07-4082-JAR |
| ) | |
| ROBERT L. DODSON, SR., et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM ORDER AND OPINION

This matter is before the Court on plaintiffs' Motion for Preliminary Injunction (Doc. 42) and defendants' Motion to Set Aside the June 13, 2007 Temporary Restraining Order (Doc. 36).[1] An evidentiary hearing was held on October 15, 2007, after which the Court gave the parties the opportunity to submit supplemental briefs in lieu of closing arguments, then took the matters under advisement. After considering the parties' submissions as well as the evidence presented at the hearing, the Court is prepared to rule. For the reasons explained in detail below, plaintiffs' Motion for Preliminary Injunction is denied, and the Temporary Restraining Order is set aside.

**I.     Procedural Background**

Plaintiffs Peter Ireland, Flightlog Pty Ltd., and Coda Superannuation Fund, ATF, sued defendants Robert L. Dodson, Sr., Dodson International, Dodson International Parts SA, Dodson's Services, Inc. d/b/a Dodson Services, Inc., Dodson Aviation, Inc., Dodson Aviation Services, and Nion, LLC in the District Court of Franklin County, Kansas relating to the sale of

---

[1] Plaintiffs have also filed a Motion Seeking Order in Civil Contempt (Doc. 41) and defendants have filed a Second Motion to Dismiss Certain Defendants (Doc. 37). These matters will be addressed in separate orders.

aircraft and related parts. In their Petition to Recover Down Payments or Enforce Agreement for Purchase of Aircraft and Other Relief, plaintiffs contended that defendants breached an agreement to sell certain aircraft and radios. Plaintiffs asserted several claims, including fraud, constructive fraud, conversion, breach of contract, breach of warranty, breach of covenant of good faith and fair dealing, and requested injunctive relief. Contemporaneously, on June 13, 2007, plaintiffs obtained a Temporary Restraining Order ("TRO") in Franklin County District Court. The TRO ordered the following restraint:

(1) All above-named defendants, their officers, agents, servants, employees, attorneys and those in concert with them from moving, operating, modifying in any way, leasing, selling, pledging, contracting in any way with respect to, committing any act which might injure the value of, or committing any act which might remove from this Court's jurisdiction the aircraft and radios described to wit: Boeing 727-100 (service number N2688Z); Cessna C172RG (service no. N172DP); Cessna C310Q (service no. N141DE); and two (2); [sic] any part, supply, document, log, record, manual, material, accession to or fuel in any of the above-referenced three (3) aircraft; GPS radios (GNS430's (2)) purchased by Ireland for installation in N2688Z;

(2) All above-named Defendants, their officers, agents, servants, employees, attorneys and those in concert or participation with them are prohibited and restrained from withdrawal, payment, use, transfer, assignment, or pledge of Dodson funds in the minimum amount of $421,500 USD with pre-judgment interest from and after May 25, 2007, at the maximum lawful rate, which restraint shall include but is not limited to Bank of America (ABA routing no. XXXXXXX93) and account XXXXXXXXXX64.

The TRO was effective immediately and was to remain in effect "until a hearing can be held on a Temporary Injunction to preserve Plaintiffs' rights and ability to recover".

On June 26, 2007, defendants removed the case (Doc. 1) on the basis of federal question jurisdiction, on the grounds that plaintiffs' claims relate to the international sale of aircraft, such that the claims are federal questions under the United Nations Convention on International

Interests in Mobile Equipment Act 2005 ("Cape Town Convention").  Defendants also contended that plaintiffs' claims related to airworthiness of the aircraft, such that the claims are federal questions under 49 U.S.C. § 40101.

Upon filing the Notice of Removal, counsel for defendants contacted this Court's chambers staff to request an emergency hearing on the continuing validity of the TRO.  Plaintiffs immediately moved to remand (Doc. 2) and to dismiss certain defendants (Doc. 5).  The Court deferred hearing the TRO issue until the remand issue was decided, as the parties were requesting the matter be heard on an expedited basis.  The Court granted defendants' request for oral argument on the motion to remand (Doc. 15) and, after a subsequent motion, granted defendants' motion to allow expert testimony on the Cape Town Convention, with certain restrictions (Doc. 26).   At the parties' request, the hearing was scheduled for August 29, 2007.

On August 27, 2007, plaintiffs moved to withdraw their motion to remand (Doc. 28).   At a telephone status conference held August 28, 2007, the parties advised that they would stipulate to federal question jurisdiction under 49 U.S.C. § 40101, and that plaintiffs had withdrawn the motion to remand.  Counsel for plaintiffs further advised that they would be filing a motion to amend their complaint, which might impact defendants' pending motion to dismiss (Doc. 5).  The Court set a hearing on the TRO for September 26, 2007, with a corresponding briefing schedule.  Accordingly, the Court denied defendants' motion to dismiss, without prejudice.  After the status conference, however, counsel for plaintiffs called to advise that his client was not available that date, and the Court rescheduled the hearing for October 15, 2007; the briefing schedule was also adjusted accordingly.

Plaintiffs' First Amended Complaint asserts the following counts: fraud, constructive

fraud, conversion, breach of contract, breach of warranty (express and implied), breach of covenant of good faith and fair dealing, corporate veil/alter ego liability, reversal of fraudulent transaction, and injunctive relief. Defendant Dodson Services, Inc., has moved to dismiss several defendants and counterclaims for breach of contract.

Defendants moved to set aside the TRO. Plaintiffs objected and countered with a motion for preliminary injunction seeking essentially the same relief afforded by the TRO, with restraint of what plaintiffs characterize as the "fruits of the fraud," the aircraft, radios and deposit funds.

## II.   Facts

Plaintiff Peter Ireland is an Australian pilot who is also in the business of acquiring and utilizing aircraft. Flightlog Pty Ltd. is a training company that "looks after" Piper aircraft. Coda Superannuation Fund, ATF, is an investment fund similar to a 401k fund. Robert Dodson, Sr. is the owner of Dodson Services, Inc., located in Rantoul, Kansas. Dodson Services is in the business of supplying and purchasing aircraft and parts for general, corporate and commercial aviation.[2] Ray Ekinci is a pilot and flight instructor for the Royal Australian Air Force.

In February 2007, Ireland and Robert Dodson, Sr. negotiated the purchase of two Boeing 727 airplanes, a 100-series and a 200-series. Using mutual friend and business acquaintance Ekinci as an intermediary in several telephone conversations, Ireland and Dodson, Sr. agreed on a purchase price of $750,000 per airplane. On February 20, 2007, Dodson Services faxed an

---

[2]http://www.dodson.com. Plaintiffs have also sued several related entities, including Dodson International and Dodson Aviation. Some of these defendants have moved to dismiss the complaint on the grounds that they were not parties to the transaction at issue. For purposes of these injunction-related proceedings, however, the Court refers only to Dodson Services, the party listed as seller in the Invoice and Sales Agreement. In so doing, the Court does not express an opinion on the merits of defendants' motion to dismiss.

Invoice and document titled "Sale of Aircraft Agreement" ("Sale Agreement") to Ireland. The Invoice listed the two 727's purchase price at $750,000 each, for a total of $1.5 million, with a $300,000 deposit to be deposited immediately to Bank of America. The balance was to be paid in 24 months, with monthly payments of $50,000 beginning March 15, 2007. The Invoice included wiring instructions for the deposit. Ireland wired the deposit on February 22 and 23, 2007.

Ireland testified that because the 200-series aircraft was in foreclosure, the sale was contingent on Dodson Services's ability to obtain clear title. Accordingly, the Sale Agreement provided that, in the event the seller was unable to secure clear title, it would be relieved of its obligation to deliver the aircraft and the purchase price for the remaining 100-series aircraft would be $750,000, paid in monthly installments of $25,000. On March 25, 2007, Dodson, Sr. informed Ireland that the 200-series 727 could not be acquired, and it was dropped from the Sales Agreement.

The Sales Agreement contained a provision for "Certificate of Airworthiness," which stated that the aircraft shall be delivered with a Certificate of Airworthiness "with all the mandatory Service Bulletins and Airworthiness Directives embodied, as required by the manufacturer and the Federal Aviation Authority up to the date of delivery." The Sales Agreement also provided that Ireland was entitled to a pre-delivery inspection of the aircraft, with the option of cancelling the Sales Agreement and obtaining a refund of any monies paid if the inspection reveals "material defects" in either the aircraft or documentation. The Sales Agreement further provided that, other than the warranties in the agreement, the aircraft is sold "as is." The Sales Agreement was never signed by either Ireland or Dodson Services.

Ireland also purchased from Dodson, Sr. an Enhanced Ground Proximity Warning System ("EGPWS") with installation, for a total price of $21,500; and he purchased two G.P.S. radios from other sources, with delivery to Dodson Services for installation in the aircraft. No evidence of a contract or agreement, other than emails referring to the transactions, was provided at the hearing.

Ireland testified that Dodson, Sr., by and through Ekinci, offered to sell Ireland two additional Cessna aircraft for the sum of $100,000. Ireland accepted the offer, wire-transferred Dodson $100,000, and requested an invoice receipt and a written contract.

Ireland testified that he was never provided the aircraft records for the 727 aircraft, despite several attempts to obtain them. Ireland was told that the documents were in Ottawa, then later that they were in South Africa, where the 727 was located. In April 2007, Ireland contacted Lee Thompson, an engineer in South Africa, and asked him to find and compile a list of documents for the 727, and to verify the status of the aircraft. Ireland testified that Thompson's research confirmed "serious deficiencies" in the airworthiness of the engines and the airframe, and indicated that some of the documents regarding the #3 engine were missing.

On May 2, 2007, Ireland talked to Dodson, Sr. and Ekinci about the problems with the 727. Ireland was concerned with a Service Bulletin that indicated that the engines needed repair and were not in compliance status. Ireland testified that Dodson, Sr. suggested they continue with the Sales Agreement, and Dodson, Sr. proposed that he would put $100,000 toward the completion of the service repairs on the engines, with Ireland to pay the balance. Ireland would repay the $100,000 to Dodson, Sr. at a later date. Ireland testified that the parties placed a "moratorium" on the installment payments in the Sales Agreement until the plane could be

repaired. Ireland testified that one engine was not able to be repaired, and, according to estimates he obtained, the cost to repair the other three ranged from $140,000 to $500,000 per engine.

On May 5, 2007, Ireland notified Dodson Sr., in care of Ray Ekinci, that he was unable to proceed with the purchase of the 727 aircraft and requested a refund of all monies paid thus far. Ireland also requested information on the location of the two G.P.S. radios so that he might arrange for pickup and forwarding. Ireland also inquired about the sale of the two Cessna aircraft, stating that he understood that the Cessnas had been provided at a discount price based on the pending sale of the 727, and offering to withdraw from that purchase agreement if it was no longer acceptable as a consequence of the termination of the 727 sale. Ireland sent another demand for refund on May 25, 2007, in the total amount of $421,500, representing the funds advanced for the 727, the two Cessnas, and the EGPWS, as well as the return of the two G.P.S. radios. Ireland testified that Dodson, Sr. responded to his demands by explaining there would be a delay in the refund because of several pending sales that had not been finalized.

Ireland testified that the potential profit for use of the 727 was $1000 per hour for a 36-month contract. He could not get an alternative plane because Dodson Services would not refund his deposit. Ireland testified that he researched the 727 and discovered the plane was previously owned by Ekinci, who transferred it to Dodson in exchange for a Learjet.

Ekinci, who is neither a party to the Sale Agreement nor a defendant, testified on behalf of the defendants. Ekinci does not consider himself an agent of either Dodson or Ireland. He testified that he has known Ireland for approximately four years, and in 2006, they contemplated going into the airfreight business together. Ekinci owned the 727 at issue from

2001 to 2003, but could not afford its upkeep after parts were stolen from it when it was parked at a South African airport. Ekinci traded the 727 to Dodson, Sr. for a Learjet in 2003. At the time of the trade, Ekinci testified that he had completed a "C-4" check on the aircraft, which he described as a very expensive and comprehensive inspection. Ekinci testified that he completed FAA-approved maintenance on the 727 just prior to its trade in 2003.

Ekinci further testified that, after the purchase of a 747 aircraft fell through, Ireland asked him for Dodson, Sr.'s phone number. Ekinci subsequently learned that Ireland was going to purchase a 727 from Dodson Sr., and Ireland asked Ekinci to arrange financing for him. Ekinci recommended Ireland lease the 727 rather than purchase it, but Ireland insisted that he wanted to purchase two 727's. Ekinci testified that while Ireland was at his house, he put Dodson, Sr. on the speaker phone and the parties firmed up the terms of a purchase agreement for the two 727's. Dodson, Sr. had originally wanted Ireland to pay installments of $100,000 per month, but agreed to $50,000 per month. Ekinci testified that Dodson, Sr. insisted that the $300,000 deposit be non-refundable, as he had other interested buyers for the 727's. Ekinci testified that Ireland agreed to these terms, and that his response was "we have a firm deal." Ekinci testified that he also helped facilitate the purchase of the two Cessnas from Dodson, Sr., which he said Ireland planned to use at a bed and breakfast he had recently purchased in Australia. Ekinci considered the $100,000 purchase price to be a "very good deal," and thought that the aircraft were actually undervalued.

Ekinci testified that Ireland complained to him about his inability to look at the documents for the 727, including the Certificate of Airworthiness, but later emailed to confirm that he had received the documents he needed. Ekinci said the logbooks were in South Africa at

a storeroom in the Dodson facility. Ekinci testified that Ireland had the full specs on the 100-series 727 before he agreed to the purchase, because Ekinci had told him he had spent a great deal of money on the C-4 inspection before the trade to Dodson in 2003. Ekinci testified that the 727 was not due for another such inspection for over 2,900 flight hours, and as far as he knew, the plane had remained grounded in South Africa from the date he traded it to Dodson until Ireland purchased it in February 2007. Ekinci admitted to giving Ireland a "bum steer" on one of the 727's engines; instead of 2009, it was up for inspection in May 2007. After Ireland notified Dodson, Sr. that he wanted out of the deal and demanded a refund, Ekinci testified that Dodson Services applied the $100,000 paid for the Cessnas to the balance owed on the Sales Agreement for the 727. Ekinci testified that he thought Ireland was in over his head financially and had underestimated the cost of owning a 727 aircraft.

## III.     Standards for Preliminary Injunction

A preliminary injunction is an extraordinary remedy that is granted as the exception rather than the rule.[3] The primary purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits in order that the trial court can then render a meaningful decision.[4] To obtain a preliminary injunction, the moving party must show a clear and unequivocal right to relief.[5] The moving party must establish the following elements to obtain relief:

> (1) a substantial likelihood of success on the merits; (2) a showing

---

[3] *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1204 (D. Kan. 2003) (citation omitted).

[4] *Id.*

[5] *SCFC ILC, Inc., v. Visa USA*, 936 F.2d 1096, 1098 (10th Cir. 1991).

> of irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.[6]

In cases where the movant has prevailed on the other factors, the Tenth Circuit generally uses a liberal standard for "probability of success on the merits," so the moving party need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."[7]

There are three types of injunctions that are disfavored in the Tenth Circuit, and thus, are subjected to a heightened burden. Those injunctions are: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.[8]  If an injunction falls into one of these categories, it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.  Furthermore . . . movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard."[9]  Neither party argues that this heightened standard applies.

The Court will discuss each element in turn.

---

[6]*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

[7]*Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980) (internal quotations omitted).

[8]*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (per curiam), *aff'd*, 126 S. Ct. 1211 (2006); *see also Schrier*, 427 F.3d at 1258–59.

[9]*O Centro*, 389 F.3d at 975–76.

### A. Irreparable Harm

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"[10] Irreparable harm is more than "merely serious or substantial" harm.[11] This requirement is met by a plaintiff demonstrating that there is a significant risk of harm that cannot be cured by monetary damages.[12] The party seeking the preliminary injunction bears the burden to show that "the injury complained of is of such imminence that there is a clear and present need for equitable relief."[13] A speculative injury or the mere possibility of harm will not suffice.[14]

Plaintiffs' action is for breach of contract. Although he also brings claims against defendant for fraud, conversion and other torts, the claims all stem from an agreement to purchase and sell certain aircraft and parts. Both parties contend that a valid and binding contract was entered between the parties, but have wildly divergent theories of the other party's respective breach of that contract. The Tenth Circuit has explained,

> The classic remedy for breach of contract is the award of money damages. However, if damages at law cannot adequately compensate the injury sustained from the breach or cannot be adequately measured, then the remedy at law is inadequate and injunctive relief providing for specific performance may be

---

[10] *Heidman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[11] *Id*. (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1235, 1250 (10th Cir. 2001)).

[12] *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (citations omitted).

[13] *Heidman*, 348 F.3d at 1189.

[14] *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003) (citation omitted).

appropriate because of irreparable injury.[15]

Where a claim is based on a breach of contract, irreparable injury for purposes of injunctive relief may be found where the subject matter of the contract is of such a special nature or peculiar value that damages would be inadequate.[16] In other words, irreparable harm is harm that cannot be undone, such as by an award of compensatory damages or otherwise.[17]

In support of plaintiffs' request for preliminary injunction, Ireland testified that he has lost business opportunities as a result of being denied the use of the aircraft in the course of operating a commercial transportation business. Significantly, Ireland admitted that he did not want any of the aircraft subject to the TRO, but only the refund of his deposit monies or other economic claims. Ireland further testified that, given Dodson's track record of filing bankruptcy and committing alleged fraud on customers such as himself, he has "no confidence" that the deposit funds will be returned. Indeed, Ireland admitted on cross-examination that he was using these proceedings to leverage money damages from defendants.

Based on the evidence offered at the hearing, plaintiffs have not established that they have or will suffer irreparable injury that would entitle them to injunctive relief. Ireland's claim of an inadequate remedy at law and irreparable harm is too speculative to permit injunctive relief. There is no evidence that the aircraft or equipment is specialized or unique. Assuming that plaintiffs did lose business because of lost contracts that depended on delivery of the

---

[15]*Tomkins Indus., Inc., Ruskin Mfg. Div. v. Sheet Metal Workers' Int'l Ass'n, Local No. 2*, 903 F. Supp. 1438, 1443 (D. Kan. 1995) (quoting *Tri-State Generation and Transmission Ass'n v. Shoshone River Power Inc.*, 874 F.2d 1346, 1354-55 (10th Cir. 1989)).

[16]*See ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (citations omitted).

[17]*Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003) (citation omitted).

aircraft, they have not established that monetary damages would not provide an adequate remedy. In fact, most, if not all, of the harms plaintiffs allege could be compensated for and remedied by money damages, and therefore are not irreparable. Moreover, Ireland's testimony about defendants' ability to pay any such monetary damages is purely speculative and lacked any evidentiary basis whatsoever. The Court finds that plaintiffs have not shown that they will suffer irreparable harm if the requested relief is not granted.

### B. Balance of Harms

Next, the Court considers whether the threatened injury outweighs the harm that the preliminary injunction may cause defendants. As explained above, plaintiffs have not shown that they will suffer immediate and irreparable harm if a preliminary injunction is not granted. Prohibiting defendants from selling the aircraft will harm defendants somewhat, especially in light of plaintiff Ireland's admission that he does not want the aircraft. Ekinci testified that Dodson, Sr. insisted on a non-refundable deposit for the 727 because there was interest in the aircraft from other buyers. On the other hand, defendants have been paid $421,500, which they continue to retain, which minimizes the economic harm they may suffer from lost sales opportunities. The Court finds that although the threatened injury to plaintiffs does not outweigh the injury defendants would suffer if the Court granted the preliminary injunction, this factor is neutral and does not weigh heavily in its determination.

### C. Public Interest

Under this element, plaintiffs must demonstrate that the injunction, if issued, is not adverse to the public interest.[18] Because plaintiffs have failed to show they are likely to prevail

---

[18]*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation omitted).

on the merits, as discussed below, the Court cannot say at this time that the public interest would be served by an injunction freezing the deposit monies and the aircraft and radios.  Moreover, plaintiff Ireland's admission that he was requesting an injunction in order to preserve assets for any monetary damages awarded is not an appropriate ground for injunctive relief, as plaintiffs' have an adequate remedy at law for their action stemming from an alleged breach of contract.

### D.     Substantial Likelihood of Success on the Merits

Where a plaintiff demonstrates that each of the first three preliminary injunction factors tip decidedly in his favor, the likelihood of success factor is somewhat relaxed and requires only that plaintiff show questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation.[19]  Because the first three factors do not tip decidedly in plaintiffs' favor, however, the Court will not apply the liberal likelihood of success test.

In this case, plaintiffs bring numerous claims against defendants, including  fraud, constructive fraud, conversion and breach of contract.  After hearing the testimony of Ireland and Ekinci, however, the Court cannot find that it is *substantially* likely that plaintiffs will prevail on the merits.  Clearly, there are two conflicting versions of the events leading up to the sale of the aircraft and subsequent attempt to withdraw from the Sale Agreement by Ireland.  Both parties contend that the Sales Agreement is a binding contract, and that the other committed the breach.  The Sales Agreement itself is unsigned and there is conflicting evidence and testimony regarding the meaning of several key terms, including but not limited to whether the 727 was airworthy, whether the aircraft were purchased "as is," and whether the $300,000 deposit was non-refundable.  As such, the Court finds that there is insufficient evidence at this time to say that

---

[19]*Id*. at 1189.

plaintiffs are substantially likely to succeed on the merits of their claims.

### IV.     Conclusion

After considering all of the relevant factors, the Court finds that plaintiffs have not shown that they are entitled to the extraordinary remedy of a preliminary injunction.  Accordingly, the Court denies plaintiffs' request for a preliminary injunction.  As a result, defendants' request to dissolve the TRO issued by the state court is granted.  Plaintiffs' request that the Court somehow maintain the TRO until such time as it determines defendants have shown proof of compliance is not warranted; the Court will address the issue of whether defendants in fact violated the TRO while it was in effect in the context of plaintiffs' pending motion for an order to show cause why defendants should not be held in contempt (Doc. 41).

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiffs' Motion for Preliminary Injunction (Doc. 42) is DENIED; and defendants' Motion to Set Aside the June 13, 2007 Temporary Restraining Order (Doc. 36) is GRANTED;

**IT IS FURTHER ORDERED THAT** defendants' Motion to Strike (Doc. 51) is DENIED as moot.

IT IS SO ORDERED.

Dated this 1st day of November 2007.

                                                 S/ Julie A. Robinson
                                                Julie A. Robinson
                                                United States District Judge